## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

ANIKA M. V.,[1]

Plaintiff,

v.                                                    ACTION NO. 2:19cv652

ANDREW SAUL,
Commissioner of Social Security,

Defendant.

## UNITED STATES MAGISTRATE JUDGE'S
## REPORT AND RECOMMENDATION

Anika M. V. ("plaintiff") filed this action for review of a decision by the Commissioner ("Commissioner") of the Social Security Administration ("SSA") denying her claim for a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act. *See* 42 U.S.C. §§ 405(g), 1383(c)(3). ECF No. 1.

An order of reference assigned this matter to the undersigned. ECF No. 11. Pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B), Rule 72(b) of the Federal Rules of Civil Procedure, and Local Civil Rule 72, it is recommended that plaintiff's motion for summary judgment, or in the alternative, motion for remand, ECF Nos. 17, 18, be **DENIED**, and the Commissioner's motion for summary judgment, ECF No. 23, be **GRANTED**.

---

[1] In accordance with a committee recommendation of the Judicial Conference, plaintiff's last name has been redacted for privacy reasons. COMM. ON CT. ADMIN. & CASE MGMT. JUD. CONF. U.S., PRIVACY CONCERN REGARDING SOCIAL SECURITY AND IMMIGRATION OPINIONS 3 (2018).

## I.     PROCEDURAL BACKGROUND

Plaintiff protectively filed an application for disability insurance benefits on or about August 28, 2016, alleging she became disabled on November 4, 2015, due to a "[b]ack injury," "[h]erniated [d]isc," and "[n]umbness in left leg and foot because of nerve damage."[2]  R. 74. Following the state agency's denial of her claim, both initially, R. 74–84, and upon reconsideration, R. 86–98, plaintiff requested a hearing before an Administrative Law Judge ("ALJ"), R. 109–10. ALJ Carol Matula heard the matter on September 26, 2018, R. 25–59, and issued a decision denying benefits on December 13, 2018, R. 8–24.  On October 3, 2019, the Appeals Council denied plaintiff's request for review of the ALJ's decision.  R. 1–5, 129–31. Therefore, the ALJ's decision stands as the final decision of the Commissioner for purposes of judicial review.  *See* 42 U.S.C. §§ 405(h), 1383(c)(3); 20 C.F.R. § 404.981.

Having exhausted administrative remedies, plaintiff filed her complaint on December 3, 2019.  ECF No. 1.  The Commissioner answered on February 3, 2020.  ECF No. 9.  In response to the Court's order, ECF No. 12, plaintiff filed a motion for summary judgment, ECF No. 17; a motion to remand, ECF No. 18; a motion to submit new and material evidence in the form of an attachment, ECF Nos. 17-1, 18-1, 19-1; and a memorandum in support of these motions, ECF No. 19, on May 4, 2020.  Defendant filed a motion for summary judgment and a consolidated response to plaintiff's motions with a supporting memorandum on June 3, 2020.  ECF Nos. 23–24.  Plaintiff did not file a reply.  As no special circumstances exist that require oral argument, the case is deemed submitted for a decision.

---

[2] Page citations are to the administrative record that the Commissioner previously filed with the Court.

## II.   RELEVANT FACTUAL BACKGROUND

### A.   *Background Information and Hearing Testimony by Plaintiff and Her Significant Other*

Plaintiff was 38 years old as of the alleged onset date of disability of November 4, 2015. R. 74. At the time of the hearing before the ALJ, she was the mother of four children—aged 20, 18, 17, and 2, and her three youngest children resided with her. R. 34–35. In 2013, plaintiff received an associate's degree in human resources. R. 35. Plaintiff's employment history includes positions as a customer sales and service representative in a call center, an administrative worker in a shipping and receiving office, an office manager[3] at a college, a housekeeper[4] for a government contractor, a testing administrator, and a personal assistant. R. 35–39, 134–37, 171–77. Plaintiff has not worked since October 15, 2015, when she went on maternity leave. R. 39–40, 163.

Plaintiff's physical troubles began following the birth of her daughter on November 4, 2015. R. 40, 248. She testified:

> After I had my baby, I think I had maybe pushed too hard or whatever, but my leg was starting to act funny and I had ended up falling down my steps at home. And once I fell down the steps, my back started hurting and I've just never been right since.

R. 40. Although she had surgery to address back pain, plaintiff described her pain since the surgery as "constant," and noted she "do[es]n't sleep well because [her] hip and [her] back are always just pain[ful]." *Id.* The pain also "shoots down [her] leg," and she "ha[s] a hard time sitting for too long, standing, [or] walking" due to the discomfort. *Id.* She uses pain medications and has received cortisone injections, but noted they were either ineffective or only provided fleeting relief.

---

[3] Plaintiff's work history report indicates that her job title was "Admissions Office Coordinator," but her hearing testimony indicates it was "office manager." *Compare* R. 171, *with* R. 37.

[4] Plaintiff's work history report indicates that her job title was "Billeting Clerk," but her hearing testimony indicates it was "like a housekeeper." *Compare* R. 171, *with* R. 38.

R. 40–41. Her pain level is reportedly a seven or eight out of ten when she gets up in the morning and she noted that pain medications might reduce the pain to around a five, but that only lasts "for a little while" when it goes back up again. R. 41. When asked if she had "any other physical issues" aside from her back, plaintiff indicated she did not. R. 42.

With respect to her mental health, plaintiff reported that she had depression, but has not received any treatment for that condition nor sought medication. *Id.*

Plaintiff also testified about her abilities and limitations. She is unable to sit for more than "maybe 30 minutes," because her leg begins to feel numb, and if she sits straight up she "would really be in pain." R. 47. Plaintiff indicated she could stand for about five or ten minutes, and that walking with a cane about 100 feet made her "feel hobbly and uncomfortable." R. 47–48. She brought a cane to the hearing and stated it helped her walk and maintain her balance when standing. R. 43.[5]

The pain also affects her interactions with her youngest child. She stated she can lift her 22 pound two-year-old child, and "usually lift[s] her and put[s] her in the highchair." R. 42, 46. But she also stated lifting her daughter hurts, so she does not do it often. R. 42. She sometimes "get[s] down on the floor" to play with her daughter, but "stay[s] down there until [she] can get back up." R. 44. She takes her daughter to the park, but only when her son goes with her "to make sure [she] can catch up to her." *Id.*

Other activities are affected as well. Plaintiff testified she sometimes goes grocery

---

[5] In a December 11, 2016, adult function report, plaintiff noted similar limitations. R. 180–87. Plaintiff indicated that her condition affected her abilities to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, and complete tasks. R. 185. With respect to sitting, in particular, she must "readjust [her] body often," and for walking, she can only go 50 to 75 feet before needing a one to three minute rest. *Id.* She uses a cane, which she needs at home "after laying in bed or sitting for a long period of time." R. 186.

shopping, but only pushes a cart if no electric ones are available and only brings her daughter if necessary. R. 44–45. She is able to take items off of the grocery shelves, unless they are high up, in which case she usually obtains help. R. 45. Similarly, her son and spouse help her unload groceries from the vehicle. *Id.* For cooking, plaintiff testified that she cooks quick meals, but her children and spouse clean the home. *Id.* For laundry, plaintiff does the folding, but needs another household member to carry the laundry basket. R. 45–46. She does not do yard work. R. 46. One month before the hearing, plaintiff won a vacation to Turks and Caicos on the radio, but noted that she was not able to enjoy herself on the trip, because she was not able to walk and had to be driven around in carts. R. 46, 48–49. Her main daily activities are watching television and playing with her daughter. R. 43–44.[6]

At the hearing before the ALJ, plaintiff's significant other also testified and corroborated much of the plaintiff's testimony. R. 49–52. She noted that due to plaintiff's back pain, she cannot interact with her daughter the way she would like, stand long enough to complete the task of

---

[6] In a December 11, 2016, adult function report, plaintiff noted similar limitations. R. 180–87. She listed daily activities as typically involving caring for and playing with her baby, cooking for the children, straightening the house, and showering. R. 180. Prior to her alleged onset date, plaintiff indicated she could carry groceries, go up and down the steps quickly while carrying laundry, clean better, cook meals that required longer preparation times, and get up from the floor easily. R. 181. Now, for grocery shopping, she must use a motorized cart and have someone else push a non-motorized cart. R. 183. For laundry, she loads the washing machine and folds the clothes, but needs someone else to carry the laundry basket, unload the washing machine, and move clothes in and out of the drier. R. 182. For household cleaning, plaintiff sweeps, but needs someone else to pick up the trash. *Id.* For cooking, she prepares frozen dinners and packaged meals that require five to ten minutes cooking, because she is unable to stand long enough to prepare meals requiring longer preparation. *Id.* She does not do yard work, observing that she cannot "bend or push a lawn mower." R. 183. Plaintiff advised that her condition has not affected her ability to handle her finances, but has impacted her hobbies and social activities. R. 183–85. She reported that she no longer goes for walks due to pain, is not as interactive with the baby, and that she is unable to sit or stand for long periods of time, which has limited her ability to watch television, movies, and sporting events. R. 184. Similarly, she "cannot be in the community as much because of pain w[ith] sitting [and] standing." R. 185.

cooking, lift the laundry basket or take out the trash, and sometimes needs someone to accompany her to the doctor's office. R. 50–51. Indeed, she advised that many tasks that were previously shared, have fallen to her as the spouse. R. 50. Further, she stated the plaintiff's condition has worsened since her surgery, noting that plaintiff now "walks more with a limp." R. 51. In addition to the physical toll, plaintiff's significant other testified that plaintiff's condition is affecting her mental state and that plaintiff is more withdrawn. R. 50–52.

## B.    *Relevant Medical Evidence*

### 1.    *Examinations by Treating Physicians*

Plaintiff received an epidural injection when giving birth to her youngest daughter on November 4, 2015. R. 245. Afterward, she reported experiencing numbness in her left side. R. 238. The numbness eventually subsided, but she was left with "intermittent lower back pain with some radiation down into her left hip and buttocks, down her left thigh." *Id.*

Roughly eight months later, on July 13, 2016, plaintiff visited Sentara Neurology Specialists for treatment. *Id.* Andrew D. Galbreath, D.O., conducted a physical evaluation. R. 239–40. He noted she had "[n]ormal tone, bulk, and power in the extremities," but that her "left leg [was] slightly guarded due to left hip/glute pain." R. 240. His report also indicated that she had a normal, casual gait, but indicated positive on the Hoffman's test and a straight leg test. *Id.*

At Dr. Galbreath's recommendation, plaintiff underwent an MRI of the lumbar spine on July 27, 2016. R. 238, 264–66. The MRI showed a large disc extrusion at L5-S1, "likely accounting for patient's left-sided symptoms," as well as a "[s]mall central disc protrusion at L3-L4 without evidence of nerve root impingement at that level." R. 264. After discussing treatment options with plaintiff, including physical therapy, epidural injections, or surgery, Dr. Galbreath noted, "Given the significance of her symptoms and the large disc, I'm going to send her right [to]

6

neurosurgery for an opinion." R. 237.

On August 15, 2016, plaintiff reported to Sentara Neurosurgery Specialist Heart Hospital for a consult. R. 234. Dana E. Adkins, M.D., reviewed the MRI and determined that it "shows a significant disc herniation at L5-S1," which "correlates extremely well with her pain." R. 237. After conducting a physical examination, Dr. Adkins recorded "normal and abnormal strength throughout[,] muscle bulk, and normal tone" and a negative Hoffman's test, but a positive straight left leg raise test. *Id.* After discussing treatment options, plaintiff "elected for an epidural steroid injection for relief of her pain," but Dr. Adkins noted that "[i]f this does not provide her significant relief[,] a minimally invasive discectomy is a nice option." R. 235.

In September and October 2016, plaintiff received epidural steroid injections, R. 229–34, 261, 263, 292, but the injections were unsuccessful, as she presented at Sentara Princess Anne Hospital's emergency department on November 15, 2016, with lower back pain radiating into her left leg, R. 304. A physical examination produced a positive result on the straight leg raise test on the left and indicated her range of movement was "limited due to pain," but that she had normal strength and was "able to bear weight with antalgic [gait]." R. 306. The attending physician observed that her back pain suggested radicular irritation, prescribed medication, and recommended follow-up with a neurosurgeon. R. 305.

Having completed a course of unsuccessful, conservative management, plaintiff returned to Dr. Adkins on November 28, 2016, and was scheduled for a minimally invasive discectomy on the left side of L5-S1 on February 1, 2017. R. 299–302.

Plaintiff underwent surgery on February 1, 2017. R. 315–23. There were no reported complications, and afterward, plaintiff reported that her pain had resolved in her left lower extremity. R. 318, 321. Prior to discharge, plaintiff was able to ambulate without a device and

negotiate stairs with supervision for safety. R. 318. She was discharged the following day. R. 319.

During the next two follow-up visits, plaintiff reported mixed results. On February 13, 2017, she indicated "the numbness and tingling she was feeling in her left lower extremity ha[d] resolved; however, she continue[d] to experience constant, shooting pain down the back of her left leg occasionally into her calf"—what she referred to in later notes as "a different kind of pain." R. 313, 340. A review of systems[7] indicated "imbalance/unsteady gait," but a physical examination revealed normal strength, symmetric reflexes, and negative results on straight leg raise tests bilaterally. R. 314–15. Similarly, on February 28, 2017, Dr. Adkins wrote that plaintiff "had complete resolution of her pain up until 2 weeks following the operation," but then "had [a] sudden recurrence of left lower extremity pain radiating down her left leg." R. 343. A review of systems again indicated "imbalance/unsteady gait." *Id.*

On March 14, 2017, a new MRI of the lumbar spine revealed that plaintiff did "not appear to have a recurrent disc herniation at L5-S1." R. 341. Amanda Brinkley, PA, at Sentara Neurosurgery Specialist Heart Hospital, gave plaintiff a temporary handicap parking pass upon request and referred her to physical therapy with the condition that she not bend, lift items greater

---

[7] A review of systems "is designed to uncover subjective complaints in particular systems" rather than document a medical diagnosis. *Brown v. Colvin*, No. 1:15cv46, 2016 WL 1261211, at *7 (W.D.N.C. Mar. 31, 2016). Specifically,

> [a] review of systems is a screening tool that relies on a patient's verbal history and consists of an inventory of the body systems. When conducting a review of systems, the medical provider poses to the patient a series of questions, arranged by organ system, that are designed to elicit the patient's signs and symptoms and uncover dysfunction or disease. The review of systems does not represent the medical provider's diagnosis, but provides information useful in making that assessment.

*Spurlock v. Astrue*, No. 3:12cv2062, 2013 WL 841474, at *26 n.11 (S.D.W. Va. Jan. 28, 2013) (quoting MCGRAW-HILL CONCISE DICTIONARY OF MODERN MEDICINE (2002)), *report and recommendation adopted by* 2013 WL 841483 (S.D.W. Va. Mar. 6, 2013).

than 20 pounds, or twist.  R. 342.

Plaintiff was evaluated at Indian River Therapy Center on March 16, 2017, and participated in four physical therapy treatment sessions that same month.  R. 337–41.  The therapist's notes indicate that her "[t]reatment has been significantly limited by pain and [her] gait pattern remains antalgic," although she did not use an assistive device.  R. 337, 341.  During this time, she reported continued lower back pain to a provider at Pleasant Valley Medical Center.  R. 532–33.[8]

At a neurology follow-up appointment on April 7, 2017, plaintiff commented that physical therapy "made things worse," but lumbar x-rays at that time revealed that "everything appear[ed] stable."  R. 334.  A review of systems again indicated "imbalance/unsteady gait" and positive Hoffman reflexes bilaterally, but a physical examination revealed normal strength and symmetric muscle reflexes.  R. 335–36.  The physical exam also showed "some signs of cervical myelopathy," so the provider recommended a cervical MRI.  R. 334.

On May 1, 2017, Dr. Adkins reviewed results of MRIs of the cervical spine and lumbar spine, performed on April 23, 2017, and March 14, 2017, respectively.  R. 356–58.  The cervical MRI revealed "mild cervical degenerative disc disease," but "no central or foramen stenosis." R. 357.  The lumbar MRI "show[ed] postoperative changes at L5-S1" and revealed "a nice resolution of her large herniated disc."  R. 357–58.  She also conducted a physical examination that indicated 5/5 for motor strength, reflexes 3+ throughout, and a positive Hoffman's test bilaterally.  R. 357.  With respect to plaintiff's continued leg pain, Dr. Adkins wrote that the pain "may be caused by permanent damage to the nerve root or temporary inflammation that will improve with time."  *Id.*  She recommended conservative management and referred plaintiff for a

---

[8] These records are handwritten and largely illegible.

"selective left L5 nerve root block." R. 357–58.

During the next three months, plaintiff underwent a battery of additional tests. The results of a lumbar spine MRI on June 10, 2017, indicated that plaintiff had a "[s]table lumbar MR exam since 3-14-17." R. 479. Plaintiff had "[v]ery minimal disc bulge, nearly normal" following her prior surgery and mild fibrosis at L5-S1 "partly involving the traversing left S1 nerve root," but "[n]o evident recurrent disc herniation or retained disc fragment." *Id.* The MRI also showed minimal disc bulge at L3-4 without root impingement and mild or minimal facet joint osteoarthritis at L4-5 and L5-S1. *Id.* A lumbar myelogram and CT scan on July 13, 2017, showed degenerative changes at L5-S1, and a small central disc protrusion at L3-L4, but no central or lateral stenosis. R. 440, 472. And, on August 10, 2017, a nerve conduction/EMG was performed over plaintiff's left lower extremity, but the results were normal and yielded "[n]o evidence of radiculopathy, mononeuropathy[,] or peripheral neuropathy." R. 437–38. Following this last procedure, the physician recommended an additional epidural steroid injection and increased her prescribed medication. R. 438.

On September 7, 2017, plaintiff presented with a cane at the emergency department of Sentara Princess Anne Hospital due to lower back pain. R. 435–37. She had "felt a pop" after turning quickly and "leaned over to pick something up off the floor and couldn't get back up because of her back pain." R. 435. Specifically, the pain was mostly right-sided, lumbar pain. R. 436. A physical examination showed normal strength, a negative straight leg test bilaterally, and that she was "able to bear weight," but her gait was antalgic, her range of movement was limited, and she had soft-tissue tenderness in the area of pain. R. 436–37. The attending physician noted that the "[b]ack pain . . . suggests radicular irritation" and prescribed pain medication. R. 435–36.

Following a referral to Sentara Interventional Pain Management Specialists, plaintiff met with George Lin, D.O., on April 3, 2018.  R. 429–34.  She reported "chronic low back sharp, stabbing, shooting pain radiating to left calf," which was "constant," and noted that she had "no adverse effects from current pain medications but pain remains uncontrolled at times."  R. 430. Dr. Lin reviewed the previous CT lumbar scan from July 13, 2017, the lumbar spine MRI from June 10, 2017, and the lumbar spine x-rays from April 7, 2017, and agreed with the findings. R. 432–33.  A physical examination showed normal lower limb strength and negative Hoffman's test, but left antalgic gait, "[p]ositive lumbar facet loading," "poor cervical and thoraco lumbar posture," "[t]ender lumbar paraspinals," and "equivocal left straight leg raises."  R. 432.  She also had "decreased flexion [and] extension due to low back pain," which was made worse with extension.  *Id.*  Dr. Lin prescribed medication, recommended aquatic therapy, and encouraged exercise 30 minutes a day, five days a week.  R. 430.  He found her BMI was 34.43 kg/m$^2$ and noted that "overweight or obesity can contribute to pain complaints."  R. 430–31.

Plaintiff returned to Indian River Therapy Center in April and May 2018.  R. 425–29.  On April 30, 2018, the therapist noted that plaintiff "continues to experience tremendous discomfort with treatment, even with water-based exercise."  R. 426.  Despite exhibiting "[i]mproved tolerance for ambulation when in water but continues to experience pain with lateral walks," plaintiff's "[gait] on [the] pool deck[] remain[ed] antalgic."  *Id.*  The therapist recommended switching to "land-based therapy to address pelvic instability and aid in improved tolerance for therapeutic exercise."  *Id.*  On May 11, 2018, plaintiff reported for therapy, but the therapist held off on the session due to plaintiff's continued pain and referred her back to her doctor.  R. 425.

Plaintiff returned to Sentara Interventional Pain Management Specialists on May 14, 2018, and saw Maria Nguyen, M.D., at the referral of Dr. Lin.  R. 417–25.  Plaintiff "rate[d] her pain

11

score as 8/10 and [noted it] can intensify to 10/10." R. 420. She described her low back pain as "constant, sharp, tingling, stabbing and burning," and added the pain was "alleviated with medication," but "worsen[ed] with walking, sitting for too long, lifting baby, bending and lying down." *Id.* A physical examination revealed an antalgic gait; an ability to toe and heel walk, but with pain; a decreased range of movement of the lumbar spine; "[p]ain with extension, flexion, [and] lateral rotation"; "[l]umbar paraspinal muscle tightness and spasms"; and "[l]umbar facet loading (lateral rotation and extension) positive on the left"; but she easily climbed to the exam table, her straight leg raise tests bilaterally were negative, she had no pain in the range of movement in the hips, and she had normal strength, intact sensation, and symmetric reflexes in her lower extremities. R. 422. "From her pain pattern and physical exam findings," Dr. Nguyen observed "a significant component of her pain is facet mediated" and recommended spinal injections or facet nerve blocks. R. 419. If successful, Dr. Nguyen recommended radiofrequency ablation,[9] which typically provides "pain relief for 6 months to 2 years." *Id.* Dr. Nguyen also "discussed the importance of weight loss with diet and exercise," as "[w]eight is contributing to spine pain." R. 420; *see also* R. 422 (noting plaintiff's BMI was 34.99 $kg/m^2$ at the time of the visit).

During doctor visits for unrelated chest pain in May and June 2018, plaintiff presented with normal gait. R. 410–12, 414–16.

On July 31, 2018, plaintiff visited Ran Vijai Singh, M.D., at Neurosurgical Associates for a neurosurgery consultation regarding her "left side lower back pain and left hip pain." R. 404–05. A physical examination showed that she was positive for back, joint, and neck pain and that she had tenderness in the left sacroiliac joint, but her "muscular strength [was] 5/5 and symmetric," her "reflexes [were] normal and symmetric," she had "no midline tenderness," her straight leg test

---

[9] The record does not indicate whether plaintiff underwent this procedure.

was negative, and she had a good range of movement.  R. 407.  Dr. Singh found she had "[s]acroiliac joint dysfunction of [the] left side" and "[c]hronic left-sided low back pain with left-sided sciatica."  R. 408.  He recommended comprehensive pain management, as well as a spinal injection.  *Id.*

Plaintiff had a follow-up visit with Dr. Lin on August 6, 2018.  R. 399–404.  A physical examination noted similar findings as the previous visit and plaintiff still had a left antalgic gait, but she was now using a straight cane.  R. 402.  Dr. Lin recommended follow-ups with Dr. Nguyen and Dr. Singh; adjusted her medication; and encouraged weight loss, exercise, and continue cane use for safety.  R. 400.

On August 15, 2018, plaintiff returned to Dr. Nguyen.  R. 394–99.  A physical examination revealed similar findings as her last visit on May 14, 2018.  *Compare* R. 397, *with* R. 422.  She recommended that plaintiff undergo a left sacroiliac joint injection, a lumbar medial branch block if pain continues, and a spinal cord simulation trial if conservative therapy is unsuccessful.  R. 394.  She also reiterated the importance of weight loss.  *Id.*  Dr. Nguyen administered the left sacroiliac injection on September 11, 2018.  R. 392–93.

The first injection provided only fleeting relief.  In a follow-up appointment on September 17, 2018, Plaintiff advised Dr. Singh that she did not have much pain for a few hours following the injection, but within 24 hours, her pain was the same as prior to the injection.  R. 386.  Dr. Singh observed that she had left sacroiliac tenderness and could not sit on her left buttocks, but that her motor and sensory functions were normal and intact.  *Id.*  He recommended she proceed with a second injection.  *Id.*  That same day, plaintiff also underwent lumbar x-rays.  R. 385, 451–52.  They showed "[m]ild degenerative changes," but were "[o]therwise, unremarkable."  R. 452.

During an emergency room visit on September 18, 2018 for shoulder pain, a physical

examination indicated plaintiff's gait was normal.  R. 380, 382.

Plaintiff returned to Dr. Nguyen on September 27, 2018, for her second injection.  R. 376–80.  She told Dr. Nguyen that the first did not improve her pain and that her pain score that day was 8–9/10.  R. 379.  Dr. Nguyen conducted a physical examination and noted "paraspinal muscle tightness" and "tenderness over the sacroiliac joints," but "normal strength in the legs."  R. 378.  She administered the second injection and scheduled a third.  R. 379.

On October 15, 2018, staff noted in a telephone encounter with plaintiff that she had not received pain relief from the first two injections, and Dr. Nguyen advised to cancel the third and schedule a follow-up in the clinic to consider other injections.  R. 375.

## 2.   *State Agency Physician Reviews*

In January and February 2017, Eric Oritt, Ph.D., and James Darden, M.D., reviewed the medical evidence.  R. 74–84.  On January 31, 2017, Dr. Oritt determined that plaintiff had three impairments—severe spine disorders, non-severe obesity, and non-severe depressive, bipolar and related disorders.  R. 78.  On February 16, 2017, however, Dr. Darden opined that the objective medical evidence alone did not substantiate plaintiff's statements about the intensity, persistence, and functionally limiting effects of the symptoms described.  R. 79.  Although the claimant indicated difficulty with "lifting, squatting, bending, standing, reaching, walking, completing tasks and other postural limitations," Dr. Darden asserted, "she is not as limited as she states."  *Id.*  He referenced "[p]hysical evidence show[ing] 5/5 strength, normal muscle bulk and tone, normal reflexes and sensory," "medical and non-medical evidence, including statements by the claimant and others, observations regarding ADLs, and alterations of usual behavior or habits."  *Id.*  Dr. Darden opined plaintiff retained a residual functional capacity ("RFC") to lift and carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk up to six hours in an eight-hour workday;

14

sit for up to six hours in an eight-hour work day; frequently climb ramps and stairs; occasionally climb ladders, ropes, and scaffolds; and frequently balance, stoop, kneel, crouch, and crawl. R. 80–81. He also noted she should "[a]void concentrated exposure" to hazards. R. 81.

Upon reconsideration on May 3, 2017, Joseph Familant, M.D., made similar findings, but further limited plaintiff's postural activities. R. 86–95. He noted she could only "occasionally" climb ramps and stairs, balance, stoop, kneel, crouch, and crawl, rather than "frequently." R. 94.

*C.    Hearing Testimony of Vocational Expert Linda Augins*[10]

At the ALJ hearing, Linda Augins, a vocational expert ("VE"), responded to the ALJ's hypothetical questions concerning the availability of jobs for a person of plaintiff's age, education, and past work experience, who is capable of sedentary work, with only occasional ability to stoop, kneel, crouch, crawl, or climb ladders, stairs, and ramps; and who can only occasionally be exposed to unprotected heights and moving mechanical parts. R. 55–56. VE Augins testified that plaintiff's previous sedentary jobs as customer service representative (*Dictionary of Occupational Titles* ("*DOT*") # 239.362-014) and office manager (*DOT* # 169.167-034) existed in the national economy for a person having such a profile. *Id.* She testified that these positions remained available even if the individual "needed to use a cane to walk and balance," and even "if the person needed to alternate sitting and standing such that she could maybe sit for 30 minutes before having to change positions" so "long as the individual remains on task at 85 percent or higher." R. 56. She noted the tolerance for absences was one to two per month. R. 57.

When asked if any of her responses had been "outside the *DOT* and the *SCO*,"[11] VE Augins

---

[10] The hearing transcript spells the vocational expert's surname as "Oggins," but her resume indicates that her surname is spelled "Augins." *Compare* R. 53–57, *with* R. 221–23.

[11] The *Dictionary of Occupational Titles*, and its companion, *Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles*, are resources used by the

indicated "[t]he use of a cane, the alternate sit/stand, time off task and absenteeism." *Id.* She noted that "those responses are based on my professional experience." *Id.* With respect to her experience, VE Augins testified that she "work[s] primarily with injured workers and people with disabilities," and that she has "been practicing for about 20 years." R. 54. Her resume corroborates this testimony, showing relevant work as a vocational rehabilitation specialist or counselor since 1998, as well as four active certifications in disability management, rehabilitation, and case management. R. 221–23.

### D.       *Document Submitted After the ALJ Decision*

Plaintiff seeks to admit additional evidence, attached to filings associated with her pending motions, not previously submitted to the SSA. *See* ECF Nos. 17-1, 18-1, 19-1 (reflecting triplicate motions to submit new and material evidence). Specifically, plaintiff seeks to admit a letter dated April 3, 2020, from Barry S. Hensley, Ed.D., a vocational expert. ECF No. 19-2.

Dr. Hensley asserts that the VE erred in her testimony. *Id.* With respect to the plaintiff's past work experience, Dr. Hensley states, "The record does support employment as a customer service representative but there is nothing in the record to support employment as an office manager." *Id.* at 1. In particular, "[t]he DOT describes an office manager as directing and managing the activities of other employees," and Dr. Hensley noted that he "found nothing in the claimant's past work that she was ever responsible for employee management." *Id.*

With respect to the VE's finding that an individual would be able to perform sedentary work, even if a cane were needed to walk and balance, Dr. Hensley asserts that such employment

---

SSA that review occupations present in the national economy and discuss physical and mental requirements pertaining to those occupations.    U.S. DEP'T OF LABOR, DICTIONARY OF OCCUPATIONAL TITLES (4th ed. 1991); U.S. DEP'T OF LABOR, SELECTED CHARACTERISTICS OF OCCUPATIONS DEFINED IN THE REVISED DICTIONARY OF OCCUPATIONAL TITLES (1993).

opportunities would be "significantly" limited. *Id.* at 1–2. He observes that "[s]edentary work requires lifting up to ten pounds" and "[c]arrying ten pounds with one hand further reduces balance and can create instability." *Id.* at 1. Because "Social Security regulation requires competitive employment standards," Dr. Hensley concluded that "[a]n individual who requires a cane to both stand and to ambulate is at a considerable disadvantage in the competitive labor market" and "consequently the number of jobs held by such persons in the national workforce is significantly quite low and usually only available to persons who held the job prior to requiring a cane to balance and to ambulate." *Id.* at 1–2.

### III.   THE ALJ's DECISION

To evaluate plaintiff's claim of disability,[12] the ALJ followed the sequential five-step analysis set forth in the SSA's regulations for determining whether an individual is disabled. R. 13–20; *see* 20 C.F.R. § 404.1520(a). Specifically, the ALJ considered whether plaintiff: (1) was engaged in substantial gainful activity; (2) had a severe impairment; (3) had an impairment that meets or medically equals a condition within the SSA's listing of official impairments; (4) had an impairment that prevents her from performing any past relevant work in light of her residual functional capacity; and (5) had an impairment that prevents her from engaging in any substantial gainful employment. R. 13–20.

---

[12] To qualify for DIB, an individual must meet the insured status requirements of the Social Security Act, be under age 65, file an application, and be under a "disability" as defined in the Act. "Disability" is defined, for the purpose of obtaining disability benefits, "as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a); *accord* 42 U.S.C. § 423(d)(1)(A). To meet this definition, the claimant must have a "severe impairment" making it impossible to do previous work or any other substantial gainful activity that exists in the national economy. 20 C.F.R. § 404.1505(a).

The ALJ found that plaintiff met the insured requirements[13] of the Social Security Act through December 31, 2020, and she had not engaged in substantial gainful activity since November 4, 2015, her alleged onset date of disability. R. 13.

At steps two and three, the ALJ found that plaintiff had the following severe impairments: (a) "status/post L5-S1 microdiscectomy"; (b) "mild local L5-S1 fibrosis partly involving left S1 nerve root"; (c) "small L3-L4 disc herniation without local root involvement"; (d) "mild right L4-L5 and L5-S1 facet joint osteoarthritis"; and (e) "obesity (BMI low 30's)." *Id.* The ALJ ruled that plaintiff failed to establish criteria to render three additional impairments severe—namely, mild cervical degenerative disc disease, chest pain, and depression. R. 13–15. She classified any additional impairments as non-severe. R. 13. The ALJ further determined that plaintiff's severe impairments, either singly or in combination (along with her other conditions), failed to meet or medically equal the severity of one of the impairments listed in 20 C.F.R. pt. 404, subpt. P, app. 1, as required for a finding of disability at step three. R. 15.

The ALJ next found that plaintiff possessed the RFC to perform sedentary work, *see* 20 C.F.R. § 404.1567(a), subject to the limitations that she: (a) can only "occasionally perform all postural activities and only be occasionally exposed to unprotected heights and moving mechanical parts"; (b) be given the opportunity "to alternate sitting and standing, such that she could sit for 30 minutes before having to change positions"; and (c) be permitted "to use a cane to walk and balance." R. 16–19.

Based upon this RFC assessment, the ALJ determined at step four that plaintiff could return to her "past relevant work as a Customer Service Representative (DOT 239.362-014, sedentary,

---

[13] In order to qualify for DIB, an individual must also establish a disability that commenced on or before the last day in which that individual met the insured status requirements of the Social Security Act. *See* 42 U.S.C. § 423(a), (c); 20 C.F.R. § 404.131(b).

SVP-5) and Office Manager (DOT 169.167-034, sedentary, SVP-7)." R. 19. Accordingly, the

ALJ did not proceed to step five and concluded that plaintiff was not disabled from November 4,

2015, through the date of the ALJ's decision and was ineligible for a period of disability, or DIB.

R. 19–20.

## IV.   STANDARDS OF REVIEW

### A.   *Standard of Review of a Social Security Disability Decision*

In reviewing a Social Security disability decision, the Court is limited to determining

whether the Commissioner applied the proper legal standard in evaluating the evidence and

whether substantial evidence in the record supports the decision to deny benefits. 42 U.S.C.

§ 405(g); *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d

585, 589 (4th Cir. 1996)); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial

evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of

N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)). "It consists of more than a mere scintilla of evidence[,]

but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th

Cir. 1966).

When reviewing for substantial evidence, the Court does not re-weigh conflicting evidence,

make credibility determinations, or substitute its judgment for that of the Commissioner. *Craig*,

76 F.3d at 589 (citing *Hays*, 907 F.2d at 1456). "Where conflicting evidence allows reasonable

minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the

[Commissioner] (or the [Commissioner's] designate, the ALJ)." *Id.* (citing *Walker v. Bowen*, 834

F.2d 635, 640 (7th Cir. 1987)). The Commissioner's findings as to any fact, if supported by

substantial evidence, are conclusive and must be affirmed, unless the decision was reached by

means of an improper standard or misapplication of the law. *Coffman v. Bowen*, 829 F.2d 514,

517 (4th Cir. 1987) (citing *Myers v. Califano*, 611 F.2d 980, 982 (4th Cir. 1980)). Thus, reversing

the denial of benefits is appropriate only if either (A) the record is devoid of substantial evidence

supporting the ALJ's determination, or (B) the ALJ made an error of law. *Id.*

**B.**     ***Standard of Review for a Sentence-Six Remand Based on New and Material Evidence***

Plaintiff has also submitted a letter that she wishes the Court to consider, which was not

before either the ALJ or the Appeals Council below. ECF Nos. 17-1, 18-1, 19-1. A district court

does not have the power to supplement the record developed before the SSA. *Smith v. Chater*, 99

F.3d 635, 638 n.5 (4th Cir. 1996) (citing *United States v. Carlo Bianchi & Co.*, 373 U.S. 709, 714–

15 (1963)). The Court may, however, consider the evidence in the context of a sentence six

remand. A district court may remand a case back to the SSA pursuant to either sentence four or

sentence six of 42 U.S.C. § 405(g). Sentence six states:

> The court may, on motion of the Commissioner of Social Security made for good
> cause shown before the Commissioner files the Commissioner's answer, remand
> the case to the Commissioner of Social Security for further action by the
> Commissioner of Social Security, and it may at any time order additional evidence
> to be taken before the Commissioner of Social Security, but only upon a showing
> that there is new evidence which is material and that there is good cause for the
> failure to incorporate such evidence into the record in a prior proceeding.

42 U.S.C. § 405(g). Under sentence six, the court "does not rule in any way as to the correctness

of the administrative determination." *Melkonyan v. Sullivan*, 501 U.S. 89, 98 (1991). "Rather, the

court remands because new evidence has come to light that was not available to the claimant at

the time of the administrative proceeding and that evidence might have changed the outcome of

the prior proceeding." *Id.* Remand is appropriate in such a situation, because, "[i]n determining

whether the ALJ's decision was supported by substantial evidence, a district court cannot consider

evidence which was not presented to the ALJ." *Womack v. Astrue*, No. 3:10cv165, 2010 WL

4874935, at *4 (E.D. Va. Oct. 20, 2010) (citing *Smith*, 99 F.3d at 638 n.5).

Accordingly, a sentence six remand is appropriate where (1) the evidence is new, that is, neither cumulative nor duplicative of evidence submitted in a prior proceeding, *see Wilkins v. Sec'y, Dep't of Health & Hum. Servs.*, 953 F.2d 93, 96 (4th Cir. 1991); (2) the evidence is relevant to the determination of disability at the time the claimant filed her application and the Commissioner's decision might reasonably have been different had the new evidence been considered; (3) there is good cause for the claimant's failure to submit the evidence when the claim was before the Commissioner; and (4) the claimant has made a general showing of the nature of the new evidence to the reviewing court, *see Finney v. Colvin*, 637 F. App'x 711, 715–16 (4th Cir. 2016); *Campbell v. Astrue*, No. 2:11cv563, 2013 WL 1213057, at *3 (E.D. Va. Mar. 1, 2013). The burden of proving these elements rests with the plaintiff. *Campbell*, 2013 WL 1213057, at *3. Further, "[i]n assessing whether the claimant has made these requisite showings . . . '[t]his Court does not find facts or try the case de novo.'" *Finney*, 637 F. App'x at 716 (quoting *King v. Califano*, 599 F.2d 597, 599 (4th Cir. 1979)).

## V.     ANALYSIS

Plaintiff advances four principal arguments to support her request for summary judgment, or in the alternative, remand. She asserts that the ALJ (1) improperly relied on the VE's testimony in finding that plaintiff could perform her past relevant work while using a cane to walk and balance, (2) erred in finding that plaintiff did not meet Listing 1.04(C), (3) erred in concluding that the plaintiff could stand or walk for two hours in an eight-hour work day in determining plaintiff's residual functional capacity, and (4) failed to adequately account for plaintiff's cervical degenerative disc disease and related pain. Mem. of Point & Authorities in Supp. of Pl.'s Mot. for

Summ. J. ("Pl.'s Mem."), ECF No. 19 at 5, 11, 14.   Each of these arguments and their sub-arguments are addressed in turn.

### A. *The ALJ appropriately applied legal standards in finding that plaintiff could perform her past relevant work while using a cane to walk and balance, and substantial evidence supports the ALJ's finding.*

As a preliminary matter, plaintiff presents multiple sub-arguments under this heading that rely on consideration of new evidence—Dr. Hensley's April 3, 2020 letter alleging errors in the VE's hearing testimony. Pl.'s Mem. 9–11; ECF Nos. 17-1, 18-1, 19-1. Because this Court may not develop the record here, *see Smith*, 99 F.3d at 638 n.5, the Court first considers whether a sentence-six remand is appropriate to allow the ALJ to consider the letter prior to addressing plaintiff's claims of error.

### 1. *A sentence-six remand is inappropriate, because Dr. Hensley's letter does not constitute new and material evidence; nor has plaintiff shown good cause for failure to obtain the letter sooner.*[14]

Plaintiff asserts that a sentence-six remand is appropriate to consider Dr. Hensley's letter pursuant to 42 U.S.C. § 405(g). ECF No. 19-1 at 2–3. She argues that Dr. Hensley's opinion is "new," because "it was not available to [plaintiff] until after the close of proceedings before the Appeals Council," and she "had bona fide reasons for not obtaining the evidence sooner," as she was unrepresented. *Id.* at 2. The letter is "material," she argues, "because 'there is a reasonable possibility that the new evidence would have changed the outcome.'" *Id.* at 3. Specifically, plaintiff argues that Dr. Hensley's letter supports the conclusion that plaintiff "cannot return to her past relevant work" if she "requires a cane for balance," and would therefore warrant a different outcome at step four of the ALJ's analysis. *Id.* at 1–2.

---

[14] Because Plaintiff attached Dr. Hensley's letter to her motion to file new and material evidence, ECF No. 19-2, she has made a general showing of the nature of the new evidence to the reviewing court and this element need not be evaluated. *See Finney*, 637 F. App'x at 716.

Defendant argues "this competing evidence does not warrant remand or otherwise undermine the substantial evidence supporting the ALJ's decision." Mem. in Supp. of Def.'s Mot. for Summ. J. & in Opp'n to Pl.'s Mot. for Summ. J. (Def.'s Mem.), ECF No. 24 at 20. First, he counters that "Dr. Hensley's letter is not 'new,'" because "[p]laintiff could have obtained vocational evidence from Dr. Hensley prior to the ALJ's decision, which means that such evidence was 'available' to her." *Id.* at 20–21. Second, he asserts that "Dr. Hensley's letter is not 'material,'" because he "offered no opinion as to Plaintiff's ability to perform her past relevant work as a customer service representative or office manager" and his observation that job opportunities for those who require a cane are limited is irrelevant at step four, because "the number of available jobs is only at issue at step five of the sequential evaluation process." *Id.* at 21–22. Finally, he contests that plaintiff's lack of representation constitutes good cause for not obtaining the evidence sooner where the plaintiff was advised of the right to representation and given an opportunity to obtain counsel. *Id.* at 22.

A sentence-six remand is unwarranted. First, although Dr. Hensley's letter is "new" in the literal sense, it is not "new" within the meaning of 42 U.S.C. § 405(g). To be considered "new," the evidence cannot be cumulative or duplicative of evidence already in the record. *See Wilkins*, 953 F.2d at 96. Here, Dr. Hensley's letter is both cumulative and duplicative, as he simply reviews the administrative record and "offers no new *facts* of any relevance." *Evangelista v. Sec'y of Health & Hum. Servs.*, 826 F.2d 136, 140 (1st Cir. 1987). Specifically, he considers the administrative record and opines that VE Augins erred in identifying the position of "office manager" as relevant prior work and that requiring a cane to walk and balance would limit job opportunities for sedentary work. ECF No. 19-2 at 1–2. "That [Dr. Hensley] happened to view this collection of data differently, that he happened to disagree with the conclusion reached by the

23

[VE and ALJ], does not render the evidence which forms the basis for his opinion any less cumulative of what already appears in—indeed, comprises the totality of—the record." *Evangelista*, 826 F.2d at 140. Indeed, granting a sentence-six remand on this ground would frustrate the purpose of the newness requirement of 42 U.S.C. § 405(g). *See Fagg v. Chater*, 106 F.3d 390, 1997 WL 39146, at *2 (4th Cir. 1997) (unpublished table decision) (denying a request for a sentence-six remand to consider an opinion letter produced after the administrative proceedings and observing, "If a losing party could vault the 'newness' hurdle of § 405(g) merely by retaining an expert to reappraise the evidence and come up with a conclusion different from that reached by the hearing officer, then the criterion would be robbed of all meaning" (quoting *Evangelista*, 826 F.2d at 140)).

Second, the letter fails the materiality requirement. To be considered "material," the evidence must be "relevant to the determination of disability at the time the claimant filed her application and the Commissioner's decision might reasonably have been different had the new evidence been considered." *Campbell*, 2013 WL 1213057, at *3. Here, the letter is *relevant* to the disability determination, as Dr. Hensley opines on an individual's ability to use a cane and perform sedentary work similar to the hypothetical question posed by the ALJ to the VE during the hearing, but the Commissioner's decision *would not reasonably have been different*. Plaintiff characterizes Dr. Hensley's opinion as asserting that "if [plaintiff] require[d] a cane for balance, she cannot return to her past relevant work," and states if this were credited, it would dispose of the case in plaintiff's favor. ECF No. 19-1 at 2. The letter, however, makes no such finding. Dr. Hensley states:

> Vocational testimony offered at the hearing also concluded that the claimant would be able to perform sedentary work, even if a cane were needed to walk and to balance. The DOT identifies that sedentary work requires two hours of standing and/or walking. If a cane is needed for walking and balancing only one hand is

therefore available to lift and to carry. Sedentary work requires lifting up to ten pounds. Carrying ten pounds with one hand further reduces balance and can create instability with both standing and ambulation.

Social Security regulation requires competitive employment standards. Jobs identified by vocational experts must meet full time competitive employment standards. An individual who requires a cane to both stand and to ambulate is at a considerable disadvantage in the competitive labor market. They are in competition with persons who do not require such devices. The use of a cane for both standing and walking usually requires a concession from employers and consequently the number of jobs held by such persons in the national workforce is significantly quite low and usually only available to persons who held the job prior to requiring a cane to balance and to ambulate.

ECF No. 19-2 at 1–2. Notably, Dr. Hensley's letter does not state unequivocally that an individual requiring a cane *cannot* return to her prior relevant work as a customer service representative or office manager, *see id.*, and even if Dr. Hensley were correct that limited job opportunities are available with that condition in the national economy, such information is irrelevant at step four of the ALJ's analysis, *see* 20 C.F.R. § 404.1560(b)(3) ("If we find that you have the residual functional capacity to do your past relevant work, . . . [w]e will not consider . . . whether your past relevant work exists in significant numbers in the national economy."). Dr. Hensley's other assignment of error in VE Augins' testimony is that plaintiff did not have past relevant work as an office manager. ECF No. 19-2 at 1. Assuming *arguendo* that Dr. Hensley is correct, the observation is irrelevant, because plaintiff could still pursue past relevant work as a customer service representative. *See* 20 C.F.R. § 404.1520(a)(4)(iv) (noting that the ALJ considers the ability of a claimant to perform any past relevant work at step four). For these reasons, plaintiff has failed to demonstrate that Dr. Hensley's letter is material.

Lastly, plaintiff failed to demonstrate there is good cause for her failure to submit the evidence when the claim was before the Commissioner. To obtain a sentence six remand, "the claimant must show that good cause exists for her failure to present the evidence earlier." *Finney,*

637 F. App'x at 716.[15]  Plaintiff argues that "she was . . . unrepresented and could not have been

expected to know . . . that [Dr. Hensley's letter] was even obtainable" or that "a reputable VE such

as Dr. Hensley could substantially contradict the vocational expert who testified at the hearing."

ECF No. 19-1 at 2.  Lack of representation, however, does not suffice to establish good cause,

particularly where the ALJ advised her of her right to obtain counsel and the desirability of doing

so.  *See* R. 27–28; *Pennington v. Colvin*, No. 14-834, 2015 WL 5334257, at *4 (W.D. Pa. Sept.

14, 2015).  Therefore, the Court finds that plaintiff has failed to demonstrate good cause.  *See*

*Wooding v. Comm'r of Soc. Sec.*, No. 4:10cv6, 2010 WL 4261268, at *6 (W.D. Va. Oct. 29, 2010)

(rejecting plaintiff's request for a sentence-six remand on the basis of a similar reappraisal from

Dr. Hensley and observing that "[g]ood cause does not exist based solely on Plaintiff's after-the-

fact desire to contradict the Vocational Expert's opinion and the ALJ's subsequent findings"

(citations omitted)).

    Accordingly, the Court **DENIES** plaintiff's motion to submit new and material evidence,

ECF Nos. 17-1, 18-1, 19-1, because Dr. Hensley's letter is not new or material and plaintiff has

not demonstrated good cause for her failure to present the evidence in earlier proceedings before

the Commissioner.

---

[15] Often, good cause can be shown by the fact that pertinent *medical* evidence was produced
following the issuance of the ALJ's opinion. *See Anderson v. Colvin*, No. 3:13cv355, 2014 WL
791876, at *6 (E.D. Va. Feb. 21, 2014) (finding that good cause existed because new medical
reports were not completed until after the ALJ's decision); *Campbell*, 2013 WL 1213057, at *7
(finding that good cause existed where a medical diagnosis was not made until after the ALJ's
decision); *Evans v. Astrue*, No. 3:09cv191, 2010 WL 451331, at *4 (E.D. Va. Feb. 8, 2010)
(finding that good cause existed where a psychology report was not produced until after the ALJ's
decision).

2.    *No apparent conflict existed between the* Dictionary of Occupational
      Titles *and the VE's testimony.*

Plaintiff's first three claims of error are:  (1) the VE failed to explain how she resolved a

conflict between her testimony and the *DOT/SCO*[16]; (2) the ALJ failed to adequately address that

conflict; and (3) the ALJ erred in accepting the VE's testimony as true regarding plaintiff's ability

to return to her prior relevant work as a customer service representative despite needing a cane for

balance.[17]  Pl.'s Mem. 5–11.  Plaintiff points to an exchange between the ALJ and the VE during

the hearing regarding whether any of the VE's testimony had been "outside the *DOT* and the *SCO*."

R. 57.  As noted earlier, the VE testified, "The use of a cane, the alternate sit/stand, time off task

and absenteeism.  That's based – those responses are based on my professional experience."  *Id.*

Plaintiff argues that the VE was obligated "to explain why her testimony should prevail over the

DOT" beyond referring generally to her experience, and the ALJ had a duty to address the conflict

and failed to do so.  Pl.'s Mem. 6, 8.  In her third claim of error, plaintiff argues that the ALJ's

finding that plaintiff required the use of a cane precluded her past relevant work as a customer

service representative according to the *DOT*'s job requirements, because she would be required to

---

[16] For ease of reference, the Court will refer solely to the *DOT*, rather than to the *DOT* and/or the *SCO*.

[17] In this third claim of error, plaintiff relies, in part, on the excluded letter from Dr. Hensley. Pl.'s Mem. 9–11. The Court finds that plaintiff's first subargument here, "The VE[] erred by finding that [plaintiff] had past work as an Office Manager," is immaterial. *Id.* at 9. As noted earlier, assuming *arguendo* that plaintiff did not have past relevant work as an office manager, she still had previous relevant work as a customer service representative. *See supra* Section V(A)(1).

With respect to the second subargument here—that "[t]he ALJ erred by accepting the VE's testimony regarding [plaintiff]'s use of the cane—the Court will not consider Dr. Hensley's letter in its evaluation. Pl.'s Mem. 9; *see supra* Section V(A)(1). Instead, the Court solely addresses plaintiff's arguments regarding any potential conflict between the VE's testimony and the *DOT* in this section without reference to Dr. Hensley. *See supra* Section V(A)(1).

finger objects frequently with one hand while holding a cane for support in the other—a limitation that would require a special accommodation, thereby rendering her disabled. *Id.* at 10–11.

Defendant argues that no conflict exists between the VE's testimony and the *DOT*, because "the use of a cane is not addressed in the *DOT*." Def.'s Mem. 16–17. Similarly, defendant asserts that the ALJ had no duty to address the issue, because the VE's testimony was not inconsistent with information in the *DOT*. *Id.* at 19. Defendant argues that plaintiff's assumption that she would require a special accommodation in order to use a cane fails for two reasons: (1) VE Augins specifically testified that in her experience, usage of a cane would not preclude such past work; and (2) the customer service representative position is sedentary, which the *DOT* notes involves mostly sitting rather than standing or walking. *Id.* at 24–25. Even if the VE's testimony did conflict with the *DOT*, defendant argues that the ALJ elicited sufficient testimony to explain the VE's response, and the VE gave an adequate explanation in stating that her testimony was based on her professional experience. *Id.* at 18–19.

Plaintiff's three claims of error are unpersuasive, because there was no apparent conflict between the *DOT* and VE Augins' testimony. Further, even if there were a conflict, the VE's explanation that her testimony was based on her professional experience was adequate and the ALJ properly relied upon it.

In *Pearson v. Colvin*, 810 F.3d 204 (4th Cir. 2015), the Fourth Circuit reviewed Social Security Ruling ("SSR") 00-4p, 65 Fed. Reg. 75760 (2000), 2000 WL 1898704, which addressed the methodology for assessing occupational information, including VE testimony, in disability claims.[18] The Fourth Circuit ruled that SSR 00-4p requires an ALJ: (1) to inquire of a VE whether

---

[18] *Pearson* specifically addressed conflicts between the VE's testimony and the *DOT* at step five of the ALJ's analysis, which the ALJ did not reach here. *See Pearson*, 810 F.3d at 207; R. 19–20. SSR 00-4p, however, addresses how ALJs should resolve such conflicts at *both* steps four and five.

the VE's testimony conflicts with job information contained in the *DOT*; (2) to also independently identify whether any apparent conflicts exist between the evidence supplied by the VE and the *DOT*; (3) to seek, with respect to any apparent conflicts identified, an explanation from the VE for any such conflict; and (4) to address whether the VE's "explanation is reasonable and provides a basis for relying on the [VE's] testimony rather than the [*DOT*]." *Pearson*, 810 F.3d at 208–11. The Court begins this analysis by reviewing the ALJ's obligations under requirements two to four.

The ALJ's duties under the second, third, and fourth *Pearson* requirements are triggered if there is an "apparent conflict" between the VE's testimony and the *DOT*. *Pearson*, 810 F.3d at 208–11. Plaintiff initially appears to suggest that a VE's testimony *automatically* creates an apparent conflict when the VE testifies to a limitation that is not covered by the *DOT*. Pl.'s Mem. 6 (asserting that the VE's testimony regarding limitations that *fell outside* of the *DOT* revealed a "conflict between her testimony and the DOT"). *Pearson*, however, rejected this very argument. 810 F.3d at 209 ("We recognize that [our holding] rejects . . . [the plaintiff]'s contention that all possible conflicts must be identified and resolved. . . . [The plaintiff]'s view would require the ALJ to do more than simply compare the express language of the [*DOT*] and the vocational expert's testimony, and would allow the claimant to nitpick an ALJ's or expert's word choice on appeal"); *see also Finnegan v. Berryhill*, No. 1:16cv1012, 2017 WL 2224332, at *5 (M.D.N.C. May 19, 2017).

Similarly, other courts have routinely found that a VE's testimony does not *automatically* create an apparent conflict where the *DOT* is silent on an issue. *See Burns v. Barnhart*, 312 F.3d

---

2000 WL 1898704, at *2. Therefore, this Court considers the guidance offered by the *Pearson* court at step five in addressing conflicts at step four as well. *See Jacob N. v. Berryhill*, No. 5:17cv57, 2018 WL 4688741, at *7 (W.D. Va. Sept. 28, 2018) (using guidance from *Pearson* in evaluating a conflict at step four of an ALJ's decision).

113, 128 (3rd Cir. 2002) (observing that, because the *DOT* did not address aptitude levels, the

VE's testimony regarding aptitude levels "was not necessarily inconsistent in this regard, so the

duty on the part of the ALJ to inquire into conflicts [pursuant to Ruling 00-4p] did not arise");

*Aquino-Hernandez v. Saul*, No. 9:19-582, 2020 WL 4678823, at *6 (D.S.C. Mar. 11, 2020) ("Mere

silence in the DOT does not equate to a conflict."); *Craig v. Berryhill*, No. 3:17cv580, 2018 WL

3636574, at *6 & n.3 (W.D.N.C. July 31, 2018) (collecting cases and observing that "[t]he Fourth

Circuit has not addressed whether the DOT's silence on a matter creates an apparent conflict that

the ALJ must raise," but agreeing with other courts that "[b]ecause the DOT is silent on the

availability of the [sit/stand] option, it cannot be said that a VE testifying about the option would

be in conflict with the DOT." (citations omitted)).

      On the other hand, the defendant overstates the inverse proposition that "where the *DOT*

does not address an issue, there can be no conflict." Def.'s Mem. 17. Although not automatic as

the plaintiff suggests, there may be instances where such a conflict could arise even if the *DOT*

does not expressly address the issue. Indeed, that was the very scenario in *Pearson*, as the court

in *Finnegan* explained:

> In some cases, an apparent conflict may arise because the *DOT*'s description of the
> applicable jobs' duties (although not expressly addressing a condition or
> circumstance) will appear to conflict with the VE's testimony. *Pearson* exemplifies
> that scenario. In that case, "[t]he ALJ found [the claimant's] nondominant arm
> could only occasionally reach upward," but for all three jobs cited by the VE, "the
> [*DOT*] lists frequent reaching as a requirement." *Pearson*, 810 F.3d at 210
> (emphasis in original). The court observed: "Although the [*DOT*] does not
> expressly state that the occupations identified by the [VE] require frequent bilateral
> overhead reaching, the [*DOT*'s] broad definition of "reaching" means that they
> certainly may require such reaching." *Id.* at 211 (emphasis in original). The court
> found the ALJ had failed to resolve the apparent conflict and remanded the case.
> *Id.* at 211–12.

*Finnegan*, 2017 WL 2224332, at *7. Therefore, if the ALJ determines that the *DOT* is silent on a

given limitation, she should then proceed to analyze whether the proposed limitation is

inconsistent, or constitutes an "apparent conflict," with an individual's ability to carry out the job duties identified by the *DOT*. *See id.*

Plaintiff has not explicitly alleged what apparent conflict exists between the VE's testimony and the *DOT*, but she alludes to one in her third claim of error. *See* Pl.'s Mem. 10–11. She argues that the *DOT*'s description of a customer service representative "requires that the individual be able to handle objects occasionally and finger objects frequently." *Id.* at 10. Therefore, "during those periods when [plaintiff] would have to stand, she would be holding a cane for balance, yet required to do—with her other hand—the frequent fingering usually done by a person with two hands." *Id.* at 10–11. She concludes this would require "a special accommodation," and that "[t]he law treats . . . those who receive a special accommodation as disabled." *Id.*

This speculative assumption does not present an apparent conflict with the *DOT*'s job descriptions for plaintiff's past relevant work that would require further discussion by the ALJ. During the hearing, VE Augins identified work as customer service representative (*DOT* # 239.362-014) and office manager (*DOT* # 169.167-034) as relevant past work in plaintiff's employment history.   R. 55; *see also Customer Service Representative*, DICTIONARY OF OCCUPATIONAL TITLES (4th ed. rev. 1991), 1991 WL 672224; *Manager, Office*, DICTIONARY OF OCCUPATIONAL TITLES (4th ed. rev. 1991), 1991 WL 647430. The *DOT*'s strength requirements for each position is the same and includes occasional exertion of ten pounds of force; a negligible amount of force frequently for lifting, carrying, pushing, and pulling; and occasional walking and standing.[19] 1991 WL 672224; 1991 WL 647430; *see also* 20 C.F.R. § 404.1567(a). Notably, the

---

[19] The description of physical demands for each position includes:

*DOT* is silent on whether an individual could meet these demands while using a cane.   As the plaintiff observes, the *DOT*'s description of the customer service representative position does include the following ability requirements: "Handling: Occasionally—Exists up to 1/3 of the time" and "Fingering: Frequently—Exists from 1/3 to 2/3 of the time."   1991 WL 672224; *see* Pl.'s Mem. 10.   The description, however, is silent as to whether these activities must be done simultaneously and while standing. *See* 1991 WL 672224.

In addition, many of the job duties identified by the *DOT* for a customer service representative[20] and an office manager[21] do not suggest that an individual would need to walk or

---

> STRENGTH: Sedentary Work - Exerting up to 10 pounds of force occasionally (Occasionally: activity or condition exists up to 1/3 of the time) and/or a negligible amount of force frequently (Frequently: activity or condition exists from 1/3 to 2/3 of the time) to lift, carry, push, pull, or otherwise move objects, including the human body. Sedentary work [involves] sitting most of the time, but may involve walking or standing for brief periods of time. Jobs are sedentary if walking and standing are required only [occasionally] and all other sedentary criteria are met.

1991 WL 672224; 1991 WL 647430.

[20] The *DOT* describes the job duties of a customer service representative as follows:

> Interviews applicants and records interview information into computer for water, gas, electric, telephone, or cable television system service:  Talks with customers by phone or in person and receives orders for installation, turn-on, discontinuance, or change in service. Fills out contract forms, determines charges for service requested, collects deposits, prepares change of address records, and issues discontinuance orders, using computer. May solicit sale of new or additional services. May adjust complaints concerning billing or service rendered, referring complaints of service failures, such as low voltage or low pressure, to designated departments for investigation. May visit customers at their place of residence to investigate conditions preventing completion of service-connection orders and to obtain contract and deposit when service is being used without contract. May discuss cable television equipment operation with customer over telephone to explain equipment usage and to troubleshoot equipment problems.

1991 WL 672224.

[21] The *DOT* describes the job duties of an office manager as follows:

32

stand while using both hands to interact with items to carry out the duties.  For instance, the *DOT* indicates that a customer service representative is expected to perform the following types of activities:  interviewing, talking, filling out forms, soliciting, adjusting complaints, and speaking on the telephone.  1991 WL 672224.  The only job duty that implicates walking or standing is that the individual "[m]ay visit customers at their place of residence to investigate conditions preventing completion of service-connection orders and to obtain contract and deposit when service is being used without contract."  *Id.*  Even so, this duty to visit customers does not suggest two hands would be needed to carry or finger items while standing or walking.

Similarly, the job description for office manager refers to the following types of activities: coordinating activities, analyzing and organizing operations and procedures, evaluating production, establishing procedures and practices, formulating procedures, planning, reviewing records, preparing reports, preparing employee ratings, conducting employee benefit and insurance programs, preparing budgets and financial reports, hiring, training, supervising, and using a

---

> Coordinates activities of clerical personnel in establishment or organization: Analyses and organizes office operations and procedures, such as typing, bookkeeping, preparation of payrolls, flow of correspondence, filing, requisition of supplies, and other clerical services. Evaluates office production, revises procedures, or devises new forms to improve efficiency of workflow.  Establishes uniform correspondence procedures and style practices. Formulates procedures for systematic retention, protection, retrieval, transfer, and disposal of records.  Plans office layouts and initiates cost reduction programs. Reviews clerical and personnel records to ensure completeness, accuracy, and timeliness.  Prepares activities reports for guidance of management, using computer.  Prepares employee ratings and conducts employee benefit and insurance programs, using computer. Coordinates activities of various clerical departments or workers within department.  May prepare organizational budget and monthly financial reports. May hire, train, and supervise clerical staff.  May compile, store, and retrieve managerial data, using computer.

1991 WL 647430.

computer. 1991 WL 672224. None of these job duties suggests walking or standing might be required—much less walk and stand while using both hands to finger items.

There was no apparent conflict. The VE testified and the ALJ determined that plaintiff could return to her past relevant work with the condition that she be permitted to use a cane for balance. *See* R. 16–20, 55–57. As explored above, this conclusion is consistent with the *DOT* for two reasons: (1) The *DOT* is silent on cane usage for the customer service representative and the office manager positions and (2) neither description's job duties implicate two-handed fingering activities while walking or standing with a cane. Other courts have reached similar conclusions. *See, e.g.*, *Cooper v. Saul*, No. 2:19cv22, 2020 WL 5525115, at *5 (W.D. Va. Sept. 1, 2020) (finding no conflict between a VE's testimony regarding cane usage for a sedentary position and the *DOT*); *Adams v. Berryhill*, No. 6:16-1721, 2017 WL 4048385, at *11 (D.S.C. July 11, 2017) (finding no conflict between a VE's testimony regarding cane usage and alternate sit/stand option for a sedentary customer service representative position and the *DOT*); *Pierre v. Colvin*, No. CV 15-02944, 2016 WL 492430, at *2 (C.D. Cal. Feb. 5, 2016) (finding no conflict between a VE's testimony regarding cane usage for an even more physically demanding, "light work" position and the *DOT*). Because no apparent conflict existed, the ALJ need not have addressed the second, third, and fourth *Pearson* obligations.

Returning to the first *Pearson* requirement, the Court finds that the ALJ erred in failing to ask the VE if her testimony *conflicted* or *was inconsistent* in any way with the *DOT*. *Pearson*, 810 F.3d at 207–08. Instead, the ALJ asked the VE if any of her testimony *fell outside* of the *DOT*. R. 57. This language is not synonymous. "Conflict" points to tension between the VE's testimony and the *DOT*, whereas "falling outside" speaks to the scope of the *DOT*. The ALJ should have asked the VE more clearly whether any of the VE's testimony was inconsistent with the *DOT*.

The Court observes that this error, however, is harmless for two reasons. First, as discussed above, there was no apparent conflict between the VE's testimony and the *DOT*. *See Finnegan*, 2017 WL 2224332, at *7 (finding ALJ's failure to ask about conflicts between VE's testimony and the *DOT* constituted harmless error where there was no apparent conflict); *Critchley v. Colvin*, No. 5:15cv8288, 2016 WL 3030211, at *8 (S.D.W. Va. May 4, 2016) (finding that "any error by the ALJ in neglecting to follow SSR 00-4p was harmless" where "there is no conflict, actual or apparent" between the VE's testimony and the *DOT*), *report and recommendation adopted by* 2016 WL 3033763 (S.D.W. Va. May 26, 2016).

Second, assuming *arguendo* that a conflict existed, the ALJ adequately resolved it by eliciting testimony from the VE explaining that her testimony regarding plaintiff's past relevant work and the limitation regarding cane usage was based on her professional experience—an explanation that the ALJ was permitted to rely upon. SSR 00-4p indicates that an ALJ may decide, as here, to rely upon a VE's testimony due to the "VE's . . . experience in job placement or career counseling." SSR 00-4p, 2000 WL 1898704, at *2; *see Biestek v. Berryhill*, 139 S. Ct. 1148, 1152–53 (2019) (noting experts may testify based upon "data otherwise developed from their own 'experience in job placement or career counseling'" (citation omitted)); *Arthur v. Berryhill*, No. 3:17cv285, 2018 WL 3233362, at *15 (E.D. Va. June 12, 2018) (finding that "[a]lthough the relevant DOT does not include the use of a cane, the ALJ appropriately relied on the VE's testimony that a claimant with Plaintiff's RFC could perform Plaintiff's past relevant work as generally performed"). Accordingly, the ALJ reasonably decided to credit VE Edwards' testimony and satisfied the requirements of SSR 00-4p.[22]

---

[22] Courts in the Fourth Circuit have regularly upheld an ALJ's reliance on such testimony from a VE. *See, e.g.*, *Conway v. Saul*, No. 1:18cv483, 2019 WL 4102184, at *6 (M.D.N.C. Aug. 29, 2019) (finding that even if a conflict existed, the ALJ addressed the issue satisfactorily when the

Because there was no apparent conflict between the VE's testimony and the *DOT*, and even

if there were, the ALJ was permitted to rely on the VE's explanation that her testimony was based

on her professional experience, the Court finds that the failure of the ALJ to explicitly ask if any

of her testimony *conflicted* with the *DOT* was harmless. *See Mickles v. Shalala*, 29 F.3d 918, 921

(4th Cir. 1994) (affirming an ALJ's decision "because there is no question but that [the ALJ] would

have reached the same result notwithstanding his initial error").

**B.**     ***The ALJ applied the appropriate legal standard in finding that plaintiff did not meet Listing 1.04C, and substantial evidence supports this finding.***

Next, plaintiff argues that the ALJ's finding that plaintiff did not meet Listing 1.04C was

"clearly erroneous." Pl.'s Mem. 11. She observes that the ALJ's lone reason for the finding was

that "[plaintiff] has at times used a cane, but at other times has not." *Id.* (quoting R. 15). "That

[plaintiff] sometimes did not use a cane is irrelevant," she argues, "because the ALJ herself

stated—without qualification—that [she] needs a cane to walk and balance." *Id.* (internal footnote

omitted) (quoting R. 16).

Defendant argues that the ALJ's reasoning was sound. He states, "The ALJ's explanation

that Plaintiff used 'a cane' (meaning, a single cane) on some occasions was sufficient to

demonstrate that Plaintiff did not have an inability to ambulate effectively, which requires two-

---

VE testified that the *DOT* did not address the given issue but the VE determined the job could be performed based upon the VE's "training, education, and experience"), *report and recommendation adopted*, 2019 WL 4674759 (M.D.N.C. Sept. 25, 2019); *see also Ray v. Berryhill*, No. 2:16cv486, 2017 WL 3599645, at *17 (E.D. Va. Apr. 28, 2017) (affirming decision when "the DOT's job descriptions for the three positions identified by the VE do not explicitly address whether the jobs must or may be performed in either a seated or standing position" and the VE testified that a claimant with certain limitations could perform those jobs), *report and recommendation adopted*, 2017 WL 3599637 (E.D. Va. Aug. 21, 2017); *see also Hershel G. v. Saul*, No. 7:18cv266, 2019 WL 4383141, at *6 (W.D. Va. Aug. 26, 2019) (noting that although the *DOT* did not address unilateral manipulative restrictions, the ALJ appropriately relied on the VE's testimony about her professional experience), *report and recommendation adopted*, 2019 WL 4345377 (W.D. Va. Sept. 12, 2019).

handed assistance with walking." Def.'s Mem. 25–26. This is so, because "[t]o satisfy Listing 1.04C, a claimant must prove that she has a disorder of the spine, with additional criteria including 'an inability to ambulate effectively,'" which is defined as "generally requiring two-handed assistance with walking, such as a two-handed walker, two crutches, or two canes." *Id.* at 25 (citations omitted).

Plaintiff's three-sentence discussion of this claim of error is unpersuasive. As the Fourth Circuit explained, "[t]o establish an impairment meeting Listing 1.04C, a claimant must show a disorder of the spine resulting in compromise of a nerve root or the spinal cord, with '[1] [l]umbar spinal stenosis resulting in pseudoclaudication, . . . [2] manifested by chronic nonradicular pain and weakness, and [3] resulting in an inability to ambulate effectively.'" *Jones v. Berryhill*, 681 F. App'x 252, 255 (4th Cir. 2017) (quoting 20 C.F.R. pt. 404, subpt. P, app. 1 § 1.04C). Social Security regulations define an "inability to ambulate effectively" as

> an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities.

20 C.F.R. pt. 404, subpt. P, app. 1 § 1.00B(2)(b)(1). Consistent with the definition's observation that such a limitation generally requires a showing of the use of "assistive device(s) that limits the functioning of *both upper extremities*" (meaning, two-handed devices), *id.*, the same regulations observe:

> [E]xamples of ineffective ambulation include, but are not limited to, *the inability to walk without the use of a walker, two crutches or two canes*, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail.

*Id.* § 1.00B(2)(b)(2) (emphasis added).

Contrary to plaintiff's assertion, the ALJ's finding that plaintiff did not meet Listing 1.04C was not "clearly erroneous." Pl.'s Mem. 11. In finding that the plaintiff did not meet the listing, the ALJ cited the relevant Social Security regulation above describing the definition of ineffective ambulation as it pertains to the Listing 1.04C criteria. R. 15 (citing § 1.00B(2)).

Further, there is substantial evidence to support the ALJ's finding that plaintiff did not meet Listing 1.04C. The record reflects that when plaintiff used a cane, she only used one cane. *See* R. 43 (noting that plaintiff brought a single cane to the hearing before the ALJ); R. 186 (noting in an adult function report that she uses a single cane); R. 402 (presenting with a single cane at a follow-up appointment with Dr. Lin). The ALJ correctly observed that there were at least two instances where plaintiff did not use a cane. *See* R. 318 (noting that on February 1, 2017, plaintiff did not use an assistive device following her surgery); R. 341 (noting that on March 16, 2017, plaintiff presented to physical therapy without an assistive device). In addition, there are other recent instances where plaintiff's gait appeared normal, despite her gait appearing antalgic elsewhere in the record. *See* R. 382 (presenting with a normal gait on September 18, 2018); R. 412 (presenting with a normal gait on June 11, 2018); R. 416 (presenting with a normal gait on May 22, 2018). And there were many indications that plaintiff possessed normal strength in her lower extremities. R. 306, 314–15, 334–36, 378, 407, 422, 432, 436–37.

Given these indications in the record, substantial evidence supported the ALJ's determination that plaintiff did not meet the criteria for Listing 1.04C—a listing that requires "an extreme limitation of the ability to walk" and generally requires an individual to need two-handed, assistive devices. 20 C.F.R. pt. 404, subpt. P, app. 1 § 1.00B(2)(b)(1), (2).

**C.** ***The ALJ applied the appropriate legal standard in finding that the plaintiff had the residual functional capacity to be able to walk or stand for two hours in an eight-hour workday with a sit-stand option and the ability to use a cane for walking and balance, and substantial evidence supports the ALJ's finding.***

Next, plaintiff argues that following step three, the ALJ erred in determining plaintiff's RFC. Pl.'s Mem. 11–14. Specifically, plaintiff argues that the ALJ improperly applied the Fourth Circuit's two-step inquiry discussed in *Craig*. *Id.* at 12 (citing *Craig*, 76 F.3d at 595). Although she observes that the ALJ properly found that a medically determinable impairment existed that could "reasonably" cause the pain claimed at *Craig* step one, plaintiff contends that the ALJ improperly discounted subjective evidence at *Craig* step two in finding that plaintiff's "pain was [not] so continuous and/or severe that it prevented her from working a full eight hour day." *Id.* at 13. Plaintiff argues that this unfavorable *Craig* step two finding was based on a number of errors: (1) "the false premise [plaintiff] 'sometimes has a normal gait without a cane,'" while "[t]he overwhelming evidence is that she often had an antalgic gait'"; (2) the ALJ's sole reliance on objective medical evidence in making her unfavorable finding at *Craig* step two, which is impermissible; (3) the ALJ's failure to specifically state what testimony she did not believe and why; and (4) the ALJ's mistaken belief that an unfavorable finding at *Craig* step two may be made "on the basis of the objective medical evidence as a whole." *Id.* at 12–14.

Defendant argues that substantial evidence supports the ALJ's determination of the RFC. Def.'s Mem. 26. He argues that "the ALJ was required to consider the objective evidence in assessing the intensity and persistence of Plaintiff's symptoms and how they affect her ability to work, consistent with 'step two' of the *Craig* analysis." *Id.* at 27. In support of the ALJ's RFC finding, defendant argues the "ALJ considered the record at length" and highlighted specific mild findings on medical images, mixed physical examination findings, and evidence in the record that plaintiff sometimes had an antalgic gait and used a cane, but sometimes did not. *Id.* at 27–29. He

asserts that "[t]he ALJ reasonably characterized this evidence in determining that Plaintiff was capable of standing and walking two hours in an eight-hour day, but that out of an 'abundance of caution,' allowed for the use of cane in standing and walking.'" *Id.* at 29; *see* R. 17, 19. Defendant contends that the ALJ did not "solely" rely on objective medical evidence in making her RFC determination at *Craig* step two, but rather considered plaintiff's complaints alongside medical source opinions from state agency physicians, plaintiff's "treatment modalities and activities," and the medical records. Def.'s Mem. 29–31.

The SSA regulations provide that, after step three of the ALJ's five-part analysis but prior to deciding whether a claimant can perform past relevant work at step four, the ALJ is responsible for assessing the claimant's residual functional capacity. 20 C.F.R. §§ 404.1545(a), 404.1546(c). The RFC is a claimant's maximum ability to work despite his limitations. 20 C.F.R. § 404.1545(a)(1). The ALJ then uses that RFC to determine whether the claimant can perform her past relevant work. 20 C.F.R. § 404.1545(a)(5)(i). The determination of the RFC is based upon a consideration of all the relevant medical and other evidence[23] in the record, including medical opinions.[24] 20 C.F.R. § 404.1545(a)(3); *Felton-Miller v. Astrue*, 459 F. App'x 226, 230–31 (4th Cir. 2011).

In addition, ALJs must follow a specific two-step inquiry (which the plaintiff and defendant refer to as the *Craig* inquiry) in order to evaluate a claimant's symptoms and any limit

---

[23] "Other evidence" includes statements or reports from the claimant, the claimant's treating or non-treating sources, and others about the claimant's medical history, diagnosis, prescribed treatment, daily activities, efforts to work, and any other evidence showing how impairments or symptoms affect the claimant's ability to work. 20 C.F.R. § 404.1529(c)(3).

[24] "Medical opinions" are "statements from acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." 20 C.F.R. § 404.1527(a)(1).

those symptoms might impose on the claimant's RFC.  The Fourth Circuit recently summarized

the two-step analysis:

> When evaluating a claimant's symptoms, ALJs must use the two-step framework
> set forth in 20 C.F.R. § 404.1529 and SSR 16-3p, 2016 WL 1119029 (Mar. 16,
> 2016).  First, the ALJ must determine whether objective medical evidence presents
> a "medically determinable impairment" that could reasonably be expected to
> produce the claimant's alleged symptoms.  20 C.F.R. § 404.1529(b); SSR 16-3p,
> 2016 WL 1119029, at *3.
>
> Second, after finding a medically determinable impairment, the ALJ must assess
> the intensity and persistence of the alleged symptoms to determine how they affect
> the claimant's ability to work and whether the claimant is disabled.  *See* 20 C.F.R.
> § 404.1529(c); SSR 16-3p, 2016 WL 1119029, at *4.  At this step, objective
> evidence is *not* required to find the claimant disabled.  SSR 16-3p, 2016 WL
> 1119029, at *4–5.  SSR 16-3p recognizes that "[s]ymptoms cannot always be
> measured objectively through clinical or laboratory diagnostic techniques."  *Id.* at
> *4.  Thus, the ALJ must consider the entire case record and may "not disregard an
> individual's statements about the intensity, persistence, and limiting effects of
> symptoms solely because the objective medical evidence does not substantiate"
> them.  *Id.* at *5.

*Arakas v. Comm'r, Soc. Sec. Admin.*, No. 19-1540, 2020 WL 7331494, at *6 (4th Cir. Dec. 14,

2020); *see also Craig*, 76 F.3d at 593–96 (describing the two-step analysis).  At step two, the

Fourth Circuit made clear that the ALJ may not require a claimant's "subjective descriptions of

her symptoms to be supported by objective medical evidence," *Arakas*, 2020 WL 7331494, at *7

(citing *Lewis v. Berryhill*, 858 F.3d 858, 866 (4th Cir. 2017)), which is defined in the regulations

as "medical signs, laboratory findings, or both,"[25]  20 C.F.R. § 404.1513(a)(1).  With respect to

---

[25] "Signs" are further defined in the regulations as "one or more anatomical, physiological, or
psychological abnormalities that can be observed, apart from your statements (symptoms)," and
"must be shown by medically acceptable clinical diagnostic techniques."  20 C.F.R. § 404.1502(g).

"Laboratory findings" are defined as "one or more anatomical, physiological, or psychological
phenomena that can be shown by the use of medically acceptable laboratory diagnostic
techniques," including "chemical tests (such as blood tests), electrophysiological studies (such as
electrocardiograms and electroencephalograms), medical imaging (such as X-rays), and
psychological tests."  *Id.* § 404.1502(c).

any medical opinions that the ALJ consults, she must explain the weight she assigns the opinion. 20 C.F.R. § 404.1527; *Arnold v. Sec'y of Health, Educ. & Welfare*, 567 F.2d 258, 259 (4th Cir. 1977).

At the first step of this two-part analysis, the ALJ determined that plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," but at the second, the ALJ found the plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medial evidence and other evidence in the record." R. 17. Then, the ALJ found that plaintiff had an RFC for sedentary work with limitations, namely:  no more than occasional performance of all postural activities; no more than occasional exposure to unprotected heights and moving mechanical parts; the ability "to alternate sitting and standing, such that she could sit for 30 minutes before having to change positions"; and the ability "to use a cane to walk and balance." R. 16.  Sedentary work is defined by the SSA as follows:

> Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. § 404.1567(a).

In deciding that plaintiff had an RFC for sedentary work in step two of the inquiry, the ALJ studied a variety of sources.  She considered medical images, including MRIs, CT scans, and x-rays, as well as their corresponding assessment and treatment notes. R. 17–19.  These include an initial lumbar MRI in July 2016 that "showed significant disc herniation," but a follow-up MRI in March 2017 after surgery that showed a "nice resolution" of her herniated disc; a cervical MRI in May 2017 that revealed "mild cervical degenerative disc disease," but "no central or foramen

stenosis"; another lumbar MRI in June 2017 showing "minimal residual disc bulge, nearly normal," mild fibrosis, minimal disc bulge, and mild arthritis; a July 2017 myelogram and CT scan showing degenerative changes; an August 2017 nerve conduction/EMG study that yielded normal results; and lumbar x-rays in September 2018 that showed "[m]ild degenerative changes," but were "[o]therwise unremarkable." R. 17–18, 237, 264, 357–58, 437–38, 452, 479. The ALJ's characterization of these as "mild findings," R. 17, 18, is substantially supported by the records.

The ALJ also considered "mixed" findings from physical examinations. R. 17–19. She observed that in 2016 plaintiff "showed some positive left straight leg raises," but also had "full strength and a normal gait." R. 17, 237, 240. Following surgery to resolve plaintiff's disc herniation in 2017, the ALJ noted that plaintiff's gait was antalgic at times and she experienced left leg, left hip, and neck pain, but she had full strength. R. 17, 341–43. The ALJ commented that plaintiff exhibited brisk reflexes and positive Hoffman's tests were indicative of possible cervical myelopathy, but added that she also had negative Hoffman's signs on more recent exams. R. 17; *compare* R. 336, 357 (positive Hoffman's tests in April and May 2017), *with* R. 402, 432 (negative Hoffman's tests in April and August 2018). She highlighted another set of mixed findings in September 2017, when the plaintiff exhibited "normal strength and negative straight leg raises, but limited range of motion due to pain and an antalgic gait." R. 18, 436–37. And an April 2018 exam showed, as the ALJ observed, that plaintiff had an antalgic gait, decreased lumbar flexion and extension, and positive lumbar facet loading, but an equivocal left straight leg test. R. 18, 432.

Contrary to the plaintiff's assertion that the ALJ erred in finding plaintiff "sometimes has a normal gait without a cane," there is substantial evidence in the record that supports this finding. Pl.'s Mem. 12 (quoting R. 17). The ALJ observed that prior to first presenting with a cane in the record in September 2017, plaintiff sometimes had an antalgic gait and sometimes had a normal

gait. R. 17–18. For instance, the record shows that in July 2016 and February 2017 plaintiff either had a normal gait or could ambulate without a device, but in November 2016 and March 2017 plaintiff was observed to have an antalgic gait. R. 240, 306, 318, 337, 341. After appearing with a cane in September 2017, plaintiff had an antalgic gait at medical appointments in April, May, August, and September of 2018, but had a normal gait at doctor visits for unrelated chest pain in May and June of 2018. R. 18, 382, 402, 412, 416, 422, 426, 432, 435. As the ALJ observed, some of these appointments were close together. *See* R. 18 (noting that plaintiff "has been observed walking with a normal gait just one week after having an antalgic gait" (first citing R. 382 (documenting a normal gait on September 18, 2018), and then citing R. 389 (documenting an antalgic gait on September 11, 2018)).

Plaintiff's continued cane usage was also inconsistent. Indeed, despite having numerous medical visits following her first presentation with a cane in September 7, 2017, the only other documented use of a cane in her doctor visits came on August 6, 2018, when she presented with a cane to Dr. Lin and he recommended she continue using the cane for safety. R. 400, 402, 435.

In addition to these sources, the ALJ also considered the available opinion evidence. She observed that both state agency medical consultants, Dr. Darden and Dr. Familant, found that plaintiff was capable of *light exertional work*, which has more demanding physical requirements than sedentary work under the SSA regulations. R. 18, 78–95; *see* 20 C.F.R. § 404.1567(b) (defining light work as involving "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds," as wells as "requir[ing] a good deal of walking or standing" among other physical requirements). Each doctor based his findings on certain limitations: Dr. Darden "opined that the claimant could frequently perform all postural activities except for occasional climbing of ladders, ropes and scaffolds," while Dr. Familant "opined that

the claimant could [only] occasionally perform all postural activities." R. 18, 80–81, 94. The ALJ gave these opinions only partial weight, because their opinions were inconsistent with the mixed physical examination findings in the record suggesting greater limitations were required. R. 19. Aside from the state agency medical consultants, none of plaintiff's treatment records indicate any restrictions on her ability to work.

The ALJ gave some credit to the testimony of plaintiff's significant other. She observed that the witness testified that plaintiff's condition had worsened, that she cannot perform activities she used to, and that plaintiff cannot lift or stand for a long time. R. 18, 49–52. In crediting the testimony, however, the ALJ only gave "some weight" to the statements, because the witness was "not a medical source and, given her relationship with the claimant, [was] not entirely objective." R. 18.

Having reviewed all the sources above, the ALJ concluded that plaintiff's "statements concerning the intensity, persistence and limiting effects of [her] symptoms are not entirely consistent with the medical evidence and other evidence in the record." R. 17. Specifically, she found that the "mild findings on various forms of imaging, mixed physical examination findings, and indications that the claimant sometimes has a normal gait without a cane" were inconsistent with the plaintiff's allegation that she possessed "a complete or near-complete inability to perform certain postural activities, such as bending or kneeling." R. 17, 18–19.

The ALJ credited plaintiff's statements, however, to the extent that they were consistent with the sources considered above. Unlike the state agency physicians, the ALJ did not find that plaintiff could perform light work. R. 18–19, 78–95. In limiting her RFC determination to sedentary work, the ALJ observed, "While the undersigned does not find the claimant to be as limited as she alleges, the records do clearly show abnormalities in [plaintiff's] lumbar spine that,

in combination with her obesity, would limit her to sedentary work." R. 19. In addition, the ALJ adjusted the RFC determination to account for plaintiff's statements. In response to plaintiff's testimony that she could only sit for thirty minutes before needing to adjust her position, the ALJ added an alternate sit/stand requirement. R. 19, 47. Despite mixed indications of the consistency of plaintiff's cane usage, the ALJ credited plaintiff's testimony that she required the use of a cane to stand and balance "out of an abundance of caution." R. 19. The record supports the ALJ's decision to accept plaintiff's statements to the extent they were consistent with the other evidence. *See, e.g.*, *Craig*, 76 F.3d at 589 (specifying that a reviewing court is not to make credibility determinations); *Hays*, 907 F.2d at 1456 (noting the ALJ bears responsibility for "mak[ing] findings of fact and . . . resolv[ing] conflicts in the evidence").

In light of this discussion of the ALJ's step two analysis, plaintiff's claims of error are not persuasive. As discussed earlier, plaintiff's gait was indeed sometimes normal and she sometimes did not present with a cane. The ALJ did not rely solely on objective medical evidence in conducting the step two analysis, but also consulted medical source opinions available. In addition, she did identify the weight given to those opinions; she gave partial weight to the state agency physicians. Finally, the ALJ did not base her finding at the second step of the two-prong inquiry on the objective medical evidence as a whole, but on the specific discussion of a variety of sources as discussed above.

Given the above objective medical evidence, opinions, and testimony, the ALJ's finding that plaintiff had a residual functional capacity for sedentary work is supported by substantial evidence.

**D.**     ***The ALJ adequately developed the record regarding plaintiff's cervical degenerative disc disease and related cervical pain, and the ALJ's finding that the condition was non-severe is supported by substantial evidence.***

Plaintiff's final claim of error is that the ALJ "failed to account for [plaintiff]'s cervical degenerative disc disease and concomitant cervical pain" at step two in classifying this impairment as non-severe. Pl.'s Mem. 14–15. Specifically, she argues that medical documents in the record indicated that the plaintiff suffered from neck pain and stiffness, but the ALJ failed to adequately develop the record by not asking about her neck pain. *Id.* at 14–15, 17. In addition, she argues that the ALJ gave an unqualified medical opinion by construing the term "mild" in the cervical MRI's finding of "mild cervical degenerative disc disease" as meaning "mild pain or non-severe impairment." *Id.* at 15–16.

Defendant argues that "the ALJ fully and fairly developed the record." Def.'s Mem. 32. He argues that the ALJ explained the plaintiff's right to counsel and gave her an opportunity to obtain counsel, confirmed her treatment providers to obtain all the necessary medical records, and elicited testimony about plaintiff's work history, activities, and limitations. *Id.* at 32–33. Defendant underscores the fact that when the ALJ specifically questioned plaintiff about her medical issues, "plaintiff did not find [her neck pain] worth mentioning." *Id.* at 33. By failing to indicate what any missing evidence would show, defendant argues that plaintiff "has failed to demonstrate prejudice" from the omission of such evidence. *Id.* Further, defendant contends that this lack of prejudice is underscored by (1) the fact that the ALJ already found one severe impairment and that finding another would be legally irrelevant; and (2) that the ALJ expressly considered plaintiff's cervical degenerative disc disease in determining her RFC and throughout her analysis. *Id.* at 33–34. Finally, defendant argues that the ALJ did consider a medical opinion on the matter. *Id.* at 34–35. She notes that Dr. Familant, the state agency physician, "specifically

47

opined that Plaintiff was limited to 'occasional' postural activities due to an MRI showing mild cervical degenerative disc disease," and that the ALJ adopted this finding "but further limited Plaintiff to only sedentary work, in part due to 'occasional signs of cervical myelopathy.'" *Id.*

Although the burden of "showing a medically determinable impairment" rests with the claimant, *Bowen v. Yuckert*, 482 U.S. 137, 146 (1987), the Fourth Circuit "has held that the ALJ has a duty to explore all relevant facts and inquire into the issues necessary for adequate development of the record, and cannot rely only on the evidence submitted by the claimant when that evidence is inadequate," *Cook v. Heckler*, 783 F.2d 1168, 1173 (4th Cir. 1986) (citations omitted). In other words, an ALJ "must fully and fairly develop the record so that a just determination of disability may be made." *Furr v. Comm'r of Soc. Sec. Admin.*, 596 F. App'x 240, 241 (4th Cir. 2015) (quoting *Clark v. Shalala*, 28 F.3d 828, 830 (8th Cir. 1994)). Where the claimant is unrepresented, this duty is heightened. *Craig*, 76 F.3d at 591 ("[O]ur own circuit has . . . held that in *pro se* cases, ALJs have 'a duty to assume a more active role in helping claimants develop the record.'" (quoting *Sims v. Harris*, 631 F.2d 26, 28 (4th Cir. 1980))). The ALJ, however, "is not required to function as the claimant's substitute counsel, but only to develop a reasonably complete record." *Bell v. Chater*, 57 F.3d 1065, 1995 WL 347142, at *4 (4th Cir. June 9, 1995) (unpublished table opinion) (quoting *Clark*, 28 F.3d at 830–31).

At step two, the ALJ concluded that plaintiff had been diagnosed with a mild cervical degenerative disc disease, but found it was non-severe, either because it "did not exist for a continuous period of twelve months, [was] responsive to medication, did not require any significant medical treatment, or did not result in any continuous exertional or nonexertional functional limitations." R. 13 (citing 20 C.F.R. § 404.1509). The ALJ complied with her duty to develop the record in making this finding and the finding is supported by substantial evidence.

Here, the ALJ complied with her duty to develop the record with respect to plaintiff's cervical degenerative disc disease.  In plaintiff's application for DIB, she indicated that she became disabled on November 4, 2015, due to a "[b]ack injury," "[h]erniated disc," and "[n]umbness in left leg and foot because of nerve damage."  R. 74.  The ALJ asked plaintiff about these issues during the hearing, but also sought to elicit other information regarding pain more broadly from plaintiff and her significant other.  Neither mentioned neck pain.  When asked how she has been feeling since her surgery over the last year and a half, plaintiff described pain in her hip, back, and leg.  R. 40.  When specifically asked if there were any other physical issues, plaintiff indicated there were not.  R. 42.  When asked to describe plaintiff's function since her surgery, plaintiff's significant other indicated that plaintiff was in pain and "walks more with a limp," but also did not mention neck pain, even when asked if there was any additional information that she believed the ALJ needed to know.  R. 51.  The ALJ also obtained all pertinent medical records.  During the hearing, the ALJ confirmed all of plaintiff's medical treatment providers and plaintiff has not alleged that there were gaps in the medical records.  R. 32–34.

Plaintiff points to medical visits in the record where she complained of neck pain and stiffness from November 2016 to July 2018.  Pl.'s Mem. 14–15 (citing R. 236, 238, 299, 303, 314, 334–35, 342, 356–57, 361–62, 365, 406, 414).  But the findings in the record concerning plaintiff's cervical degenerative disc disease did not appear to require any significant medical treatment, as the ALJ found.  Indeed, when reviewing the April 2017 MRI of her cervical spine, Dr. Adkins diagnosed plaintiff with "mild cervical degenerative disc disease," but chose to include no treatment for the condition in her assessment/plan while simultaneously recommending treatment for her lumbar spine.  R. 357.  Similarly, in August 2018, Dr. Lin reviewed the same MRI, and elected not to include any treatment for this specific condition.  R. 400, 402.  As noted above, by

the time of the hearing before the ALJ in September 2018, plaintiff did not mention neck pain when given opportunities to do so. In light of these indications in the record, the ALJ's finding that plaintiff's cervical degenerative disc disease was non-severe for such reasons as not requiring significant medical treatment is supported by "more than a mere scintilla of evidence." *Laws*, 368 F.2d at 642.

Plaintiff requests a remand to instruct the ALJ to obtain an expert opinion as to whether plaintiff's cervical degenerative disc disease impacted her ability to work, but the ALJ did consider medical opinions from the state agency physicians on the matter in her RFC determination. Having reviewed plaintiff's medical records, including those documenting her cervical degenerative disc disease, the state agency physician, Dr. Familant, concluded that plaintiff could perform light work. R. 86–95. Given the plaintiff's "occasional signs of cervical myelopathy," however, the ALJ chose to include more extensive work restrictions than those called for by Dr. Familant. R. 19.

Further, plaintiff has not demonstrated prejudice that would warrant remand. A reviewing court should remand the case "[w]here the ALJ fails in [her] duty to fully inquire into the issues necessary for adequate development of the record[] *and such failure is prejudicial* to the claimant." *Marsh v. Harris*, 632 F.2d 296, 300 (4th Cir. 1980) (emphasis added). "Prejudice can be established by showing that additional evidence would have been produced . . . and that the additional evidence might have led to a different decision." *Ripley v. Chater*, 67 F.3d 552, 557 n.22 (5th Cir. 1995); *see also Teachey v. Colvin*, No. 4:14cv178, 2016 WL 958201, at *4 (E.D.N.C. Mar. 8, 2016), *aff'd by* 671 F. App'x 150 (4th Cir. 2016). As explored above, the ALJ adequately developed the record with respect to plaintiff's cervical degenerative disc disease—she asked both plaintiff and her significant other about the nature of plaintiff's pain, obtained and considered a complete compilation of plaintiff's treatment records that included treatment notes related to the

condition, and considered a report of a state agency physician, Dr. Familant, who reviewed plaintiff's medical history, including the condition, and opined that plaintiff could perform light work. Plaintiff has not indicated what additional evidence regarding her cervical degenerative disease might have shown. Considering this record and absent a showing of what additional evidence might show, plaintiff has not demonstrated prejudice that would warrant remand. *See Teachey*, 2016 WL 958201, at *4 (noting that "plaintiff has not explained what the missing evidence would have shown and therefore has failed to demonstrate prejudice from its omission" and finding no good cause for remand).

## VI.   **RECOMMENDATION**

For the foregoing reasons, this Court recommends that plaintiff's motion for summary judgment, or in the alternative, motion for remand, ECF Nos. 17, 18, be **DENIED**, and the Commissioner's motion for summary judgment, ECF No. 23, be **GRANTED**.

## VII.   **REVIEW PROCEDURE**

By copy of this report and recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(C):

1.     Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within fourteen (14) days from the date this report is forwarded to the objecting party by Notice of Electronic Filing or mail, *see* 28 U.S.C. § 636(b)(1), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure. Rule 6(d) of the Federal Rules of Civil Procedure permits an extra three (3) days, if service occurs by mail. A party may respond to any other party's objections within fourteen (14) days after being served with a copy thereof. *See* Fed. R. Civ. P. 72(b)(2) (also computed pursuant to Rule 6(a) and (d) of the Federal Rules of Civil Procedure).

2.     A district judge shall make a *de novo* determination of those portions of this report

or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and

recommendations set forth above will result in a waiver of appeal from a judgment of this Court

based on such findings and recommendations. *Thomas v. Arn*, 474 U.S. 140 (1985); *Carr v. Hutto*,

737 F.2d 433 (4th Cir. 1984); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).

_____
/s/

Robert J. Krask
UNITED STATES MAGISTRATE JUDGE

Norfolk, Virginia
January 7, 2021